# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 265 | **DATE** | 3/31/2003 |
| **CASE TITLE** | Willie Sutton vs. Illinois Department of Transportation | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTERED MEMORANDUM OPINION AND ORDER: Defendant's motion for summary judgment [42-1] is granted. Defendant's motion to strike portions of plaintiff's response to defendant's local rule 56.1(a) statement of facts [53-1] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

courtroom deputy's initials

MAR 31 2003

date docketed

docketing deputy initials

date mailed notice

Document Number

U.S. DISTRICT COURT
CLERK
03 MAR 31 PM 2:55

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WILLIE E. SUTTON,            )
                                       )
            Plaintiff,          )
                                         )      No. 99 C 0265
             v.                   )
                                         )      Judge Joan B. Gottschall
ILLINOIS DEPARTMENT        )
OF TRANSPORTATION,         )
                                         )
            Defendant.        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Willie E. Sutton brings this action against his employer, the Illinois Department of Transportation ("IDOT") pursuant to 42 U.S.C. § 2000e, *et seq.* ("Title VII") alleging that he was discriminated against because of his race, was subjected to a "hostile work environment," and was retaliated against because of his complaints of race discrimination. IDOT has moved for summary judgment on all counts. For the reasons explained below, IDOT's motion for summary judgment is granted. IDOT's motion to strike portions of plaintiff's response to defendant's statement of facts is granted in part and denied in part.

**DOCKETED**

MAR 3 1 2003

### Analysis

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once the moving party shows that there is no genuine issue of material fact, the burden shifts to the

nonmoving party to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Second Amended Complaint ("Complaint") in this case contains two counts: Count I, "Discrimination Based Upon Race" and Count II, "Discrimination Based Upon Race – Retaliation." Defendant has moved for summary judgment arguing:

    1.    Sutton's allegations of incidents occurring prior to November 13, 1996, are barred by Title VII's 300-day limitation period.

    2.    Sutton cannot establish a *prima facie* case of discrimination or retaliation because he cannot establish discrimination by direct evidence and cannot establish a prima facie case under *McDonnell Douglas* because he can establish neither an adverse action nor that non-black employees were treated better than he was.

    3.    Sutton cannot establish a *prima facie* case of a racially hostile environment because the incidents relied on by Sutton are insufficient to meet the test for a racially hostile environment, and, even if Sutton was subjected to a racially-hostile work environment, the perpetrator, Vince LaRusso, was Sutton's coworker and not his supervisor, some of LaRusso's statements were made outside the 300-day limitation period and Sutton cannot establish that IDOT was negligent in failing to discover or remedy the alleged harassment.

    4.    Sutton cannot establish a *prima facie* case of retaliation because he was not subject to an adverse action and because he cannot establish that any non-protected employees were treated more favorably than he was.[1]

---

[1]Defendant asks the court to take judicial notice of a decision by Judge Zagel granting summary judgment to the defendant in a case brought by one of plaintiff's coworkers. The court does not need to take judicial notice to consider other decisions by other judges. If what

Sutton's Complaint collapses the two distinctly different bases for recovery, discrimination based on discrete acts and discrimination based on a hostile work environment claims. *See Nat'l R.R. Pass. Corp. v. Morgan*, 122 S.Ct. 2061, 2073 (2002). The analysis of plaintiff's evidence is distinctly different depending on plaintiff's theory of recovery. The 300-day limitation of Title VII is irrelevant to a hostile environment claim, as long as plaintiff filed his charge within 300 days of the occurrence of any act that is part of his hostile work environment claim. *Id.* at 2075. Defendant's statute of limitations argument is thus irrelevant to plaintiff's hostile environment claim, as is defendant's contention that plaintiff has failed to allege an adverse action, since in a claim of hostile work environment, it is the entire pattern of conduct, not any single act, that is the focus of the claim.

*Discrimination Based on Race – Non-Hostile Work Environment Claim*[2]

The court will first look at defendant's adverse action argument to see if plaintiff has any evidence that would permit him to go forward on a discrete act discrimination claim. Plaintiff lists many allegedly "discriminatory" acts, but he makes little or no attempt to identify adverse actions within the meaning of the law. An adverse employment action is "'a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

---

defendant is actually seeking is that this court in some manner consider itself bound by that case, or hold that plaintiff is in some way collaterally estopped by that case, the request is denied. The case involves different facts and a different plaintiff.

[2]Plaintiff's failure to discuss these issues within any framework of analysis that corresponds to Seventh Circuit precedent has left the court unsure of whether he is trying to press such a claim.

Adverse actions include terminations of employment, demotions, salary decreases and conditions of employment that are designed to harass and humiliate. *Id.* The law is clear that negative performance evaluations, standing alone, do not constitute adverse actions. *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996).

Among Sutton's claims of discriminatory acts are many, such as the use of racially derogatory terms, which could form part of a pattern of harassment, but which are not alterations in the terms or conditions of his employment such that they are actionable standing alone. Of the allegedly discriminatory acts which he lists, only four appear to the court to be even arguably adverse actions of this sort: verbal reprimands on January 7 and January 4, 1999, and a write-up on February 8, 1999. In addition, plaintiff has alleged that he was forced to patch potholes in a dangerous location because of his race.

With respect to the write-ups and reprimands, Sutton has not offered evidence that these incidents implicated sufficiently tangible job consequences to constitute an independent basis for liability. *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001). In *Oest*, the Seventh Circuit ruled that such job-related criticisms were insufficient to constitute adverse actions even though they led to the plaintiff's termination. In the case at bar, the alleged criticisms led to no tangible job consequences at all. To the extent plaintiff seeks to hold defendant liable for each of these criticisms, each claim is dismissed and defendant's motion for summary judgment is granted.

With respect to plaintiff's pothole-patching claim, the court believes that requiring an employee to carry out an assignment which puts him at undue physical risk based on racial animus could, in some circumstances, constitute an actionable act of discrimination. Plaintiff alleges that on two occasions, March 11, 1998 and December 6, 1996, he was directed to patch potholes in an

4

unprotected line of traffic, an assignment that plaintiff "did not observe being given to white workers." (Pl.'s Statement of Additional Facts ("Additional Fact"), ¶ 4.) What plaintiff observed, however, is meaningless in the face of undisputed evidence that a white worker, Bachmeier, was also directed to patch potholes in an exposed lane and did so. (Pl.'s Rule 56.1 Response, ¶ 32.) Moreover, plaintiff admits that two other white workers were directed to patch potholes in exposed traffic, although both refused the assignment. (*Id.* at ¶¶ 33, 34.) Plaintiff cannot show, and he need not, what, if anything, would have happened to him if he, like these two white workers, had refused to carry out the assignment, but the fact that three white workers were given the assignment, and one performed it, weakens, probably fatally, the allegation that the assignment was racially motivated. Given that plaintiff was directed to do this work on only two occasions spaced years apart, given that he was not injured despite the risks of the work and has claimed no specific injury or damages arising from this incident, given that a white employee did the same work and given that two other white employees were directed to do the work but failed to do it, this is too weak a reed on which to rest an independent claim of discrimination.

Plaintiff has not come forward with evidence of an independently actionable adverse action. Accordingly, the court need not reach defendant's arguments that any claimed adverse actions are outside the statute of limitations. Defendant's motion for summary judgment on plaintiff's claim of race discrimination independent of his hostile environment claim, if indeed plaintiff is attempting to assert such a claim, is granted.

*Race Discrimination – Hostile Work Environment*

Plaintiff's hostile work environment claim stands on a different footing. For one thing, as stated above, defendant's argument based on the 300-day statute of limitations for filing discrimination claims does not apply to plaintiff's hostile work environment claim as long as any act contributing to the alleged hostile environment took place within that time period. *Morgan,* 122 S. Ct. at 2068. Further, the unlawful employment practice at issue in a hostile environment claim consists of the cumulative effect of individual acts, many or all of which might not be actionable on their own. *Morgan,* 122 S. Ct. at 2073-74. "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan,* 122 S. Ct. at 2074. In attempting to assess whether a hostile environment claim satisfies the necessary elements that the complained-of circumstances were both subjectively and objectively offensive, that the harassment was based on plaintiff's membership in a protected class and that the conduct was severe and pervasive, *see, e.g., Cerros v. Steel Tech., Inc.,* 288 F.3d 1040, 1045 (7th Cir. 2002), it is the complained-of acts in their cumulative force that must be assessed, not any one act standing alone.

Defendant attacks plaintiff's hostile environment claim on the grounds that the incidents on which plaintiff bases his claim are not severe or pervasive enough to alter the terms of plaintiff's employment, under the objective or subjective standard. Further, defendant argues that the alleged harasser, LaRusso, was not plaintiff's supervisor and, additionally, that plaintiff "cannot establish that IDOT was negligent in either discovering or remedying the alleged harassment." (Def.'s Mem. at 12.)

6

*The Status of LaRusso*

The court first addresses LaRusso's status. The following facts are based on the parties' Rule 56.1 submissions. Vincent LaRusso was the "Acting Lead" or crew leader on plaintiff's crew for a disputed amount of time from December 15, 1995 through April 30, 1998; plaintiff avers that LaRusso was "Acting Lead" on a continuous basis throughout this period, while defendant claims he acting as Acting Lead only occasionally. Plaintiff has submitted an affidavit averring that LaRusso was his Acting Lead for the entire time period he describes. Defendant has submitted an affidavit from IDOT's Personnel Services Manager, Fulgenzi, which avers that LaRusso held this position "from time to time" during this period. However, the court cannot determine the meaning of "from time to time" and will accept plaintiff's unequivocal "entire time" affidavit at least as creating a material factual dispute on the question of the period during which LaRusso was plaintiff's Acting Lead. The parties also dispute the amount of authority LaRusso held in that position. With respect to the responsibilities and powers of the Acting Lead, Fulgenzi avers that LaRusso had no supervisory authority over the members of the crew and had no authority to "hire, fire, demote, promote, transfer or discipline." Fulgenzi's averments, however, are based on IDOT personnel records, and presumably reflect standard job descriptions rather than actual field practices. Plaintiff asserts that "LaRusso had the power to control terms and conditions of employment as was perceived by workers and himself as a supervisor." (Pl.'s Rule 56.1 Response, ¶ 11.) To support this proposition, plaintiff cites three deposition excerpts. A coworker named Cosmen testified that LaRusso was his supervisor at some undefined time and place. LaRusso, in his deposition, testified that he "had Willie Sutton several times," most reasonably construed as meaning he was in some sense the leader or supervisor of Sutton's crew. It is clearly undisputed that at some points in time,

LaRusso "directed" plaintiff's job activities. In its Reply Brief, defendant appears to concede, at least for purposes of its summary judgment argument, that "LaRusso may have occasionally acted as the leader of the crew to which Sutton was assigned and as a result, may have 'run the crew' and 'gave orders.'"[3] (Def.'s Reply at 8.) Defendant argues, however, that these limited supervisory activities were insufficient to render LaRusso plaintiff's supervisor for liability purposes.

In *Parkins v. Civil Constr. of Ill., Inc.,* 163 F.3d 1027 (7th Cir. 1998), the Seventh Circuit observed that employers bear heightened liability for the illegal conduct of a supervisor when a supervisor's conduct is made possible by an abuse of his supervisory authority, his apparent authority or because his supervisory position aided him in accomplishing the harassment. *Id.* at 1033. "The essence of supervisory status is the authority to affect the terms and conditions of the victim's employment" which "primarily consists of the power to hire, fire, demote, promote, transfer or discipline an employee." *Id.* at 1034. Where the harasser is a supervisor and the victim suffered no tangible employment action, the employer is strictly liable, although the *Ellerth-Faragher* defense may be available. Under the *Ellerth-Faragher* defense, provided that no "tangible employment action" resulted from the supervisor's harassment, IDOT can avoid liability for racial harassment by its supervisors by proving: "(a) that the employer exercised reasonable care to prevent and correct promptly [the] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Mason v. So. Ill. Univ.,* 233 F.3d 1036, 1043 n.4 (7th Cir. 2000).

Where the harasser is not a supervisor, on the theory that employers do not entrust co-

---

[3] While plaintiff did not point this out, the court notes that coworker Rodriguez also viewed LaRusso as his supervisor. (Def. Ex. I at 15.)

employees with "any significant authority with which they might harass a victim," employers are liable for harassment of one employee by another only when they have been negligent in either discovering or remedying the harassment. *Parkins*, 163 F.2d at 1032. Employers adequately discharges their legal responsibility in the case of harassment of one employee by another if they "take 'reasonable steps to discover and rectify acts of [] harassment.'" *Id.* (quoting *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997)).

The plaintiff in *Parkins* alleged sexual harassment by two foremen who periodically functioned as her supervisors when she was present on job sites where they were working. These foremen were actually laborers who punched a time card, were paid an hourly wage, received overtime pay and were members of the union. Neither ever substituted for a superintendent and both worked as foreman only when foreman work was available. They otherwise functioned as ordinary laborers. In these circumstances, the Seventh Circuit concluded that they were not supervisors. The court noted as significant that the foremen did not make decisions about what work was to be done at a site, and the plaintiff did not work exclusively at their sites; indeed, she was not a laborer but rather a truck driver at these sites. "At most, Boeke and Strong [the alleged harassers] would tell her where to dump or pick up a load." *Id.* at 1034. The foremen, like the *Parkins* plaintiff, themselves answered to a supervisor who made all significant decisions and evaluated the employees. The foremen could not even require plaintiff's presence at a job site.

The Seventh Circuit looked closely at this issue again in *Hall v. Bodine Elec. Co.,* 276 F.3d 345 (7th Cir. 2002). In *Hall,* plaintiff claimed harassment by Lopez, one of two or more "set-up operator[s]" who had the responsibility to assign plaintiff to the machine on which she would work. The court rejected the argument that Lopez was plaintiff's supervisor, even assuming that he "(1)

possessed the authority to direct her work operations (i.e., which machines she ran); (2) provided input into her performance evaluations, and (3) was charged with training her and other less experienced employees." *Id.* at 355. "The type of marginal discretion Lopez had over Hall's work operations," the Seventh Circuit held, "is not sufficient to impute Title VII vicarious liability to an employer." *Id.*

The parties have done a poor job of providing detailed information from which a decision about LaRusso can safely be made. Defendant provides the affidavit of Giovanni Fulgenzi who avers that LaRusso had no supervisory authority over any crew member, including plaintiff, and had no authority to hire, fire, demote, transfer, promote or discipline. Fulgenzi's affidavit is extremely conclusory, and fails even to explain how, if LaRusso had no supervisory authority, he was able to direct the work activities of his crew. While it is conceivable, as in *Hall, supra,* that someone could have authority to direct the work of a crew but no other authority, the Fulgenzi affidavit does not descend to this level of specificity. Plaintiff has pointed to an excerpt from LaRusso's deposition in which he discussed which black maintainers "worked for me."

Defendant objects to plaintiff's affidavit and the factual assertions it makes, complaining that plaintiff's statements lack foundation. At least to some extent, defendant is wrong. Plaintiff's statement as to how often LaRusso was his Acting Lead does not lack foundation since it is based on his own observation. His averments and those of his co-worker Cosmen that LaRusso had supervisory authority are indeed conclusory and without foundation, although they are no more conclusory than the Fulgenzi affidavit.

The court concludes that LaRusso's testimony, in which he states that various black road maintainers worked for him, is some evidence that he believed he had supervisory authority, which

10

may well indicate that he had some. Plaintiff has provided adequate evidence that LaRusso was frequently his Acting Lead and had authority to direct his work, including discretion to decide how, if at all, the workers would be protected while conducting patching activities.

The language in *Hall* would appear at first glance to apply to LaRusso, whose authority over plaintiff apparently extended only to job assignments. But the case at hand is significantly different from *Hall* in that one of the acts of harassment which forms the basis for plaintiff's claim related directly to that authority – specifically, LaRusso's authority to direct plaintiff to work in circumstances which endangered his life. Thus, it appears that in the specifics of the road maintainer workplace, the Lead's or Acting Lead's authority to direct the road maintainer's work operations includes the discretion to make choices that can put the road maintainer at serious physical risk. For instance, it appears that it was up to LaRusso to decide what safety precautions would be in place for the patching activities he directed. With that authority came the power to misuse his authority to effect the terms and conditions of plaintiff's employment in a concrete and possibly life-threatening way. When viewed in conjunction with plaintiff's sworn affidavit that LaRusso continually served as Acting Lead over an extended period of time, plaintiff's evidence that LaRusso had the discretion to require plaintiff to work in extremely risky conditions is sufficient, at the very least, to create a factual dispute as to whether LaRusso was a supervisor for Title VII purposes.[4] However, this disputed fact, in light of the court's resolution of the hostile work environment claim, does not effect the court's final disposition of the case.

---

[4] This finding is relevant for what defenses, if any, the employer may raise.

*Hostile Work Environment*

Defendant next argues that the incidents on which plaintiff relies to establish a hostile work environment are not severe or pervasive enough to make out an actionable case of harassment. Defendant assumes for purposes of summary judgment, and plaintiff does not dispute, that at some point "beginning on December 18, 1995," plaintiff heard LaRusso say that he hated "spicks," "pollacks" and "slant-eyed fuckers."[5] No evidence of how often this took place has been provided. At some point plaintiff heard LaRusso call George Fountain, an African-American IDOT employee, "shine."[6] In 1996, Jaeger, the Lead Lead Worker at the North Side Sign Shop (plaintiff worked in the Yard, not in the Shop so Jaeger was not his supervisor), referred to plaintiff as "smile" and said "I can't see you." Jaeger later apologized to plaintiff for making these comments. On May 20, 1997, plaintiff heard LaRusso describe an African-American employee named Harry as "working like he's on a plantation."

Besides these comments made in his presence, plaintiff complains of a number of incidents which he maintains contributed to the hostile environment in which he alleges he worked. Plaintiff's Rule 56.1 materials in support of these allegations are lacking in some significant respects, and the court will discuss these problems in the context of discussing the alleged incidents.

Plaintiff asserts that on January 10, 1997, LaRusso directed that plaintiff's time card be changed to show a midnight arrival at the yard, rather than a 12:10 a.m. arrival. From what the court can determine, what plaintiff is complaining about is that after having worked in snowy conditions,

---

[5] These comments are not derogatory to African-Americans, so they are marginal support for plaintiff's claim.

[6] This comment is racially derogatory, but it is not aimed at plaintiff, presumably lessening to some extent its impact on him.

he returned to the yard after the end of his shift to sign out, but was directed to record his time as midnight, presumably the end of his shift. He refused and signed out accurately at 12:15, but LaRusso subsequently had his record changed back to midnight. Had plaintiff's time card accurately reflected a sign out after midnight, he would have been entitled to an extra day's pay. Plaintiff is thus complaining that LaRusso's fabrication of the time he signed out cost him a day's pay. There is no suggestion that any white worker was treated differently, so the court intuits that plaintiff's complaint is simply that LaRusso treated him badly.[7] In any event, besides his own recitation of this incident, plaintiff cites the deposition testimony of Klupshas, which supports plaintiff's claim that if he came in after midnight, he should have received an additional day's pay. Klupshas says nothing about LaRusso, let alone that LaRusso manipulated plaintiff's time card to deprive him of a day's pay, says nothing about whether plaintiff actually lost the day's pay, and says nothing about why, if plaintiff lost the day's pay, he did so.

In another claimed incident of harassment, plaintiff complains that after he filed an internal discrimination complaint against LaRusso sometime in 1997, he was sent to IDOT's Schaumberg office with no notice for a hearing on his complaint and was required to ride in the car with LaRusso. Plaintiff's record support for this complaint is his answer to Interrogatory No. 1, and in his answer, he appears to be relying on hearsay by a certain Henry Blevins. Plaintiff is required to support his allegations with admissible evidence. "[H]earsay is inadmissible in summary judgment proceedings to the same extent that is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003) (support for Rule 56.1 statements

---

[7] The court cannot help but note that if plaintiff claims that his superior's impropriety cost him a day's pay, he should have been able to have the matter corrected through the grievance procedure. Surely the grievance procedure addresses such time card issues.

must be admissible evidence). The court assumes, however, that plaintiff could support this assertion with his own sworn testimony, so it will not be disregarded. However, the question remains, What does this all mean? Why did plaintiff get no notice and who was responsible? How did getting no notice prejudice plaintiff? Who required him to ride with LaRusso? There is insufficient information about this incident to allow the court to draw any inference that it was part of a pattern of harassment.

Plaintiff asserts that on March 31, 1998, LaRusso assigned him to "work in the rain alone with a stop paddle, a task not assigned to white workers (generally responsibility for the stop paddle was alternated)." For record support for this assertion, plaintiff again cites his response to Interrogatory No. 1, relying on an unsworn, hearsay statement by Henry Blevins, whom plaintiff avers "has knowledge of offering LaRusso the use of another worker to work with Sutton on that date, an offer Larusso [sic] declined." Plaintiff avers that Blevin told him that "on April 1, 1998, two workers were assigned to the last truck to rotate the stop paddle." It should not have to be pointed out that plaintiff's sworn statement of what some other person said to him is not competent evidence sufficient to carry his burden of coming forward with evidence in response to defendant's motion for summary judgment. *Eisenstadt*, 113 F.3d at 742. Not only is Blevins' statement unsworn hearsay, but no foundation for Blevins' knowledge is provided. In addition, while an act of harassment does not have to rise to the level of concreteness or severity of an adverse action, the court has no idea how difficult or burdensome it is to work in the rain alone with a stop paddle. The fact that on one occasion two workers were assigned to a job that on one occasion plaintiff was assigned to alone does not prove anything about how many workers were typically assigned to this job, or whether it was unfair to require plaintiff to do the job alone. There is inadequate evidence here to permit any

14

inference of an act of racial harassment.

Plaintiff complains that on July 10, 1998, he found on his shop locker a flier with a picture of African males with enlarged testicles bearing the caption "side effects of Viagra." Pablo "Peppy" Pepin, a highway maintainer and plaintiff's coworker, admitted to plaintiff that he had brought the flier to the Sign Shop, and he apologized to plaintiff, stating that he had not meant any offense. Plaintiff made clear at the time of the incident, and it appears to be his position today, that he viewed Pepin's conduct as thoughtless rather than racist. Plaintiff complains, however, that Roger Jaeger, the Lead Worker in the Sign Shop (and thus a supervisor, although not plaintiff's supervisor), knew about the poster and gave Pepin permission to copy it. Plaintiff is also disturbed that when he found the poster, he complained to Jaeger and Jaeger acted as if he was disturbed by the poster, which was obviously false. Jaeger was disciplined for his involvement, but the discipline was set aside when he grieved it. Pepin was disciplined as well. The Viagra poster is the kind of incident that could contribute to a racially hostile work environment, if it was part of a pattern of severe or pervasive conduct.

Plaintiff complains that on January 4, 1999, he received a verbal reprimand for allegedly taking two hours to get a plow guide on a truck when he was doing other work in the yard at the time. (Pl.'s Additional Fact ¶ 1.) Plaintiff testified at his deposition that he was hard at work doing his assigned jobs in the yard when Klupshas (a supervisor) and Adamik walked up to him. Adamik stated that "Frank [Klupshas] wanted to know" why plaintiff was still in the yard. Plaintiff went to talk to Klupshas who told him that yes, he had wanted to know why it had taken plaintiff two hours to put on a plow guide. Plaintiff explained that he had been doing other work as well. It is not clear why plaintiff believes that Klupshas knew what he had been doing. It appears that plaintiff received some

15

verbal criticism or comment rather than anything as formal as a reprimand, because defendant's records reflect that the only discipline plaintiff ever received was one written reprimand on February 8, 1999. Regardless, unjustified criticism by a supervisor on a repeated basis could constitute harassing behavior. Unfortunately for plaintiff's claim, however, it does not appear that plaintiff was subject to such criticism on a repeated basis; rather, it appears that he was criticized allegedly unjustly no more than three times in three years.

Plaintiff claims his second verbal reprimand three days later, on January 7, 1999. He states that he was reprimanded "for remaining in the maintenance yard while white workers looked on and were not reprimanded." (Pl.'s Resp.at 5.) Plaintiff cites as support for this ¶ 41 of his Additional Facts, but 41, in violation of the local rule, contains no record citation. It should therefore be stricken and disregarded. However, the court, on its own, has noticed that plaintiff describes this incident in his sworn answer to Interrogatory No. 1. He states that a number of employees were in the yard and he was singled out for the direction by his supervisor Adamik, who in turn was directed by a higher-level supervisor Klupshaw, "to hurry up, get his truck loaded with salt and get out of the building." This verbal direction had no impact on plaintiff's job status.

On March 31, 1999, plaintiff's pager went off in the presence of Klupshas, Adamcik and Richard Marrese, a white highway maintainer. Klupshas stated to plaintiff, "Oh, you must be a drug dealer." Plaintiff states that several white workers had pagers and were not asked this question. Plaintiff's answer to Interrogatory No. 1 supports the utterance of the statement, but says nothing about white workers who were not asked the same question. Plaintiff also cites his deposition in which he testified as to Klupshas' statement but provides no support for his assertion that he was the

only individual with a pager to whom this was said. This statement, while trivial standing alone, again could be experienced as harassing if part of a series of frequent, repeated such comments.

Plaintiff complains that he was singled out for an extremely dangerous work assignment patching potholes in an unprotected lane of traffic on two occasions, December 6, 1996, and March 11, 1998. It is questionable whether plaintiff will be able to establish any basis for an inference that this incident was racially animated. It is undisputed that three white workers were ordered to do this same work and one in fact performed the task, as did plaintiff, although the two other white workers refused. Plaintiff attempts to deal with this proof problem by asserting, in his Additional Fact ¶ 4 that plaintiff "did not observe" this assignment being given to white workers. But plaintiff's observation, when all of the evidence is to the contrary, proves only that plaintiff was mistaken as to the facts and that is irrelevant to his charge of racial harassment. Plaintiff cites the Safety Code (Ex. F), but it is not clear to the court what provision he is relying on, and it is of no consequence. A work director who improperly puts his black *and* white workers at unnecessary risk is guilty of something, but it is not race discrimination. The court has considered this evidence, as described above, as evidence that LaRusso had supervisory authority. It is not evidence of racial harassment and is disregarded in assessing the severity and pervasiveness of plaintiff's claimed hostile environment.

Plaintiff asserts that on February 8, 1999, he received an unjustified write-up for failing to be available for call-in. For support, plaintiff cites his answer to Interrogatory No. 1, which is lengthy, and he does not direct the court's attention to any specific portion of it. It appears that he may be relying on the fourth paragraph of page 2, recounting a January 10, 1999 incident in which a Douglas Carmichael told plaintiff that he had tried to call plaintiff at about 4:00 p.m. to come into work, but plaintiff did not respond. Plaintiff avers that he was home all afternoon, and the purported call did

not show up on his caller i.d. unit, voicemail or answering machine. Plaintiff asserts that he had information that Carmichael was a friend of LaRusso's. Plaintiff further avers that he made Klapshas aware that he disputed the Carmichael claim but he received a write-up anyway. The defense claims that there is no record support for this self-serving testimony, but there need not be anything beyond plaintiff's sworn statement. If the jury believes him, they would be entitled to view this as a possible act of harassment.

Plaintiff also complains of a number of alleged racist statements made outside his presence. Such statements may be relevant to show plaintiff's employer's racial animus, but must have been known by the plaintiff in order to be considered for purposes of a hostile work environment analysis. *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 n.7 (8th Cir. 1999) (evidence of what alleged harasser said to others about plaintiff is relevant so long as plaintiff knew of statements during the time he experienced harassment). Sutton asserts that he knew of the statements made to others about him. However, unfortunately for plaintiff, little of the record support he cites for these alleged statements are competent evidence, and there is no basis, therefore, for inferring that he will be able to prove these matters at trial, as is his burden in opposing summary judgment:

(a) Lorenzo Rodriguez, a highway maintainer with IDOT, testified that LaRusso "would talk bad about different groups of people" such as "Blacks, Hindus, Puerto Ricans, Polacks, anything, everything." This is competent evidence but its vagueness is problematic in terms of assessing the severity of the complained-of conduct; with no definition of what "talking bad" means and no date or indication of frequency, its probative value on this subject is minimal.

(b) Plaintiff relies on an unsworn statement by Rodriguez to the effect that he heard LaRusso state, referring to Sutton, "I hate that fuckin' nigger." This unsworn statement is rank hearsay and must accordingly be disregarded.[8]

(c) Plaintiff provides an unsworn statement by coworker Cosmen (Ex. O), a "Questionnaire" which the court guesses was part of defendant's internal investigation. In response to a directive to "give examples of racial remarks" made by LaRusso, Cosmen writes: "Like those Pollacks or these Blacks or these Jews." This unsworn statement is not competent evidence in opposition to a motion for summary judgment.

(d) As his Additional Fact ¶ 22, plaintiff states that "LaRusso's frequent racial slurs and comments were common knowledge in IDOT's Northside Maintenance Yard, where Sutton worked." This statement is supported only to a limited extent by the record citations cited to support it: John Agosto testified in his deposition that on one occasion he heard LaRusso (it is assumed) refer to "Willie" (the plaintiff, it is assumed) "in a moment of anger" "as a nigger or shine"; Lorenzo Rodriguez testified in his deposition that LaRusso said, "[tell] that fucking nigger to get his ass out of the yard.[9] Beyond this, the court can find nothing in Additional Fact ¶ 22's record references that appears to be competent evidence of anything. Plaintiff cites the Sandoz deposition, but the excerpt provided is Sandoz' description of the complaints plaintiff made to him. Plaintiff also cites the

---

[8]For this reason, all of plaintiff's Additional Facts based on his answer to Interrogatory no. 1, except insofar as they are matters about which Sutton has personal knowledge, are stricken: ¶ 3 (hearsay statement of John Agosto); ¶ 8 (hearsay statement of Bob Cole); ¶ 9 (hearsay statement of Lorenzo Rodriguez); ¶ 10 (hearsay statement of John Agosto); ¶ 15 (hearsay statement of Michael Rychtanek).

[9]The court must assume that this truncated deposition excerpt refers to a statement by LaRusso about plaintiff, although plaintiff has not made this clear.

Thomas deposition, but the cited excerpt includes only Thomas' repetition of complaints plaintiff made to him and Thomas' own opinion that LaRusso "made a lot of racial remarks about everybody and his opinion that a lot of what plaintiff thought were racist things were really "yard thing[s]," hardly helpful testimony for plaintiff.

(e) In plaintiff's Additional Fact ¶ 10, plaintiff asserts that LaRusso referred to plaintiff as "nigger" and "coon." As record support, plaintiff cites his answer to Interrogatory no. 1. Plaintiff has verified his answer to Interrogatory no.1, so anything stated therein based on plaintiff's personal knowledge is competent evidence. However, for this alleged statement by LaRusso, plaintiff states in his answer to Interrogatory no. 1 that a certain John Agosto said that on January 10, 1997, LaRusso made statements about plaintiff like "where's that fuckin' nigger," "who does that fuckin' nigger think he is" and "this coon thinks he can do what he wants." This is nothing but an unsworn out-of-court statement by Agosto introduced for its truth and is not competent evidence in opposition to a motion for summary judgment.

(f) Additional Fact ¶ 23 must also be disregarded. Plaintiff asserts that Klupshas, a supervisor, stated that a water fountain was going to be installed in the back of the building for "colored people," citing as record support Rodriguez' deposition. What Rodriguez testified to in this deposition excerpt, however, was that Johnny Jones told Rodriguez that Klupshas had said this. Johnny Jones' statement is hearsay, and cannot be considered in opposition to defendant's motion.

(g) Additional Fact ¶ 36 states that Rodriguez heard LaRusso tell Lead Worker Goduto to get on the radio to plaintiff and tell "that fucking nigger to get his ass in the yard." The record support plaintiff's cites is plaintiff's affidavit. But plaintiff's affidavit merely sets forth something Rodriguez

20

told plaintiff he heard LaRusso say. The Rodriguez statement is unsworn hearsay that is incompetent to prove anything for summary judgment purposes.

When the court boils down the evidence to only that which is properly considered,[10] the court cannot conclude that Sutton has provided sufficient evidence so severe or pervasive as to alter the conditions of his environment and create a hostile working environment. *Mason*, 233 F.3d at 1043. In light of Sutton's failure to present admissible evidence on most of his allegations, the court will grant defendant's motion for summary judgment.

## *Retaliation*

In *Haywood v. Lucent Technologies, Inc.*, the Seventh Circuit reviewed the ways in which a *prima facie* case of retaliation can be established:

> The plaintiff may establish a *prima facie* case of retaliation in one of two ways. First, [he] may present direct evidence of a statutorily protected activity, an adverse action and a causal connection between the two. . . . The second is the indirect method, our "adaptation of *McDonnell Douglas* to the retaliation context." At the first stage, the plaintiff must show that (1) [he] engaged in statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite [his] satisfactory job performance, [he] suffered an adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

No. 01-4092, 2003 WL 1400496, at *5 (7th Cir. Mar. 20, 2003) (citations omitted).

Inasmuch as the court has found that plaintiff has not come forward with evidence of a discrete adverse action or with competent evidence of a hostile work environment (which considered as a whole could be viewed as the equivalent of an adverse action), summary judgment must be granted in favor of defendant on plaintiff's retaliation claim. Insofar as the court might be willing

---

[10] The court notes that it has not listed every instance cited by Sutton. Those events not listed here also fail because Sutton has not provided admissible evidence in support.

to consider the directive that he patch potholes in an exposed traffic lane as an adverse action, the only incident of which plaintiff complains which could possibly rise to that level, plaintiff has come forward with no evidence of a causal connection between his statutorily protected complaints and this work assignment, so he is relegated to the second, indirect method of establishing a *prima facie* case of retaliation. Under the second method, he plainly fails because the undisputed evidence establishes that three other employee were directed to carry out the same assignment and one of those employees, Bachmeier, did so, and plaintiff has offered no evidence that Bachmeier had engaged in statutorily protected activity.

Plaintiff argues that he should not have to show that others who did not engage in statutorily protected activity were treated better than he because this requirement was imposed in *Stone v. City of Indianapolis Public Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), announced after pleading and discovery in this case were completed. Plaintiff requests that if the court grants summary judgment on this basis, he should be allowed to replead and conduct additional discovery. The court rejects this request for a number of reasons. First, the court notes that a plaintiff who feels he has been prejudiced by a change in the law after discovery has closed has no right to sit and wait to see if the court decides his case adversely to him based on that change in the law. Seventh Circuit opinions announced during the pendency of a case in the district court apply to that case. If plaintiff felt that *Stone* made additional discovery or repleading necessary, he should have been before this court the day after *Stone* was decided to seek what he needed, not insert this argument in his summary judgment briefing. His request comes much too late. Second, as *Hayward* makes clear, *Stone* simply provides an additional method of proving retaliation, one which is generally much less demanding for plaintiffs than a test requiring proof of a causal relationship. Third, the court would

22

be very happy to apply the pre-*Stone* test if plaintiff could satisfy it, which he cannot. Plaintiff's argument that the pothole patching assignments were retaliatory fails the pre-*Stone* test. As far as the court can tell, the protected activity which forms the basis for plaintiff's retaliation theory was the filing of a complaint regarding LaRusso with IDOT's EEO office on July 24, 1997. And, as far as the court can tell and as described above, plaintiff comes forward with no direct evidence of causation. He must be relying, therefore, on temporal proximity to raise an inference of causation. The pothole patching incident of which plaintiff complains took place on March 11, 1998, approximately 8 months after plaintiff's EEO complaint. If plaintiff is relying entirely on temporal proximity to give rise to an inference of causation (as was common before *Stone*), eight months is too long. *See Oest,* 240 F.3d at 616 n.8 (citing numerous pre-*Stone* cases); *Fischer v. Ameritech,* No. 98 C 7470, 2002 WL 1949726, at *7 (N.D. Ill. Aug. 23, 2002) (eight months is too long).

Summary judgment is granted in favor of defendant on plaintiff's retaliation claim.

*Defendant's Motion to Strike*

Defendant's motion to strike portions of plaintiff's response to defendant's local rule 56.1(a) statement of facts is granted to the extent set forth in this opinion and otherwise denied.

ENTERED:

JOAN B. GOTTSCHALL
United States District Judge

Dated: March 31, 2003

23